# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
| --- | --- |
| HEALTHALLIANCE HOSPITALS, INC., *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )  No. 1:17-cv-917 (KBJ) |
| ALEX M. AZAR, Secretary of Health and Human Services, | ) ) ) ) |
| Defendant. | ) ) ) |

## <u>MEMORANDUM OPINION</u>

Legal issues that arise under the federal government's Medicare and Medicaid programs tend to be "significantly more difficult to describe than to decide[.]" *Cooper Hosp./Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 36 (D.D.C. 2016) (internal quotation marks and citation omitted). The instant matter is no exception; it involves a claim by twelve Massachusetts hospitals ("the Hospitals" or "Plaintiffs") that the Secretary of the Department of Health and Human Services ("HHS" or "Defendant") did not fully compensate the Hospitals in the manner that the Medicare program prescribes for a one-year period, from October 1, 2008, to September 30, 2009. (*See* Compl., ECF No. 1, ¶ 45.) Invoking the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), as well as a federal law that prescribes additional payments to hospitals that serve a "disproportionate number of low-income patients" under the Medicare program, 42 U.S.C. § 1395ww(d)(5)(F)(i)(I), the Hospitals allege that they are entitled to $6 million more from the federal government than they received during the relevant timeframe for

their service to low-income individuals, because HHS miscalculated the percentage of patients who are eligible for Medicaid and similar services within the meaning of the applicable regulations and thus improperly lowered the amount of money that the federal government owes. (*See* Compl. ¶¶ 2, 45.)

Whether these contentions have merit turns on a relatively narrow dispute over the meaning of an HHS regulation that delineates how the agency will determine the proportion of low-income individuals that a hospital serves. *See* 42 C.F.R. § 412.106(b)(4). This regulation establishes a formula that requires consideration of "the number of the hospital's patient days of service" for two categories of low-income individuals: (1) Medicaid-eligible patients, and (2) patients who are "deemed eligible for Medicaid" for the purpose of the regulation because they are "eligible for inpatient hospital services . . . under a waiver authorized under section 1115(a)(2) of the [Social Security Act.]" *Id.* § 412.106(b)(4)(i). The Hospitals contend that HHS has incorrectly interpreted this regulation to exclude from the second category those patients who are insured under a Massachusetts-run health insurance program for low-income individuals known as Commonwealth Care, which received a section 1115(a)(2) waiver from HHS and thereby indisputably "expand[s] upon the traditional Medicaid program eligibility criteria[.]" (Compl. ¶¶ 2, 45.)

Before this Court at present are the parties' cross-motions for summary judgment. (*See* Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem."), ECF No. 12; Def.'s Mem. in Supp. of its Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Mem."), ECF No. 14-1.)[1] In its papers, HHS argues that, in order to

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

determine whether a patient is "eligible for inpatient hospital services . . . under a waiver authorized under section 1115(a)(2)," 42 C.F.R. § 412.106(b)(4)(i), and is thus to be deemed eligible for Medicaid for purposes of the regulation's calculation, *see id.*, the court must "look[] to the terms of the [waiver] agreement that describe the project" to see if the Secretary has stated explicitly that covered patients are "eligible for inpatient hospital services" (Def.'s Reply in Supp. of its Cross-Mot. for Summ J. ("Def.'s Reply"), ECF No. 19, at 5 (internal quotation marks and citations omitted)). And because no such explicit statement appears in the waiver agreement that Massachusetts and HHS entered into in regard to Commonwealth Care, HHS contends that the patient days relating to the treatment of Commonwealth Care beneficiaries do not count in the Medicare-reimbursement formula that the regulations prescribe. (*See id.* at 5–6.) The Hospitals respond that HHS's explicit-statement requirement is contrary to both the plain language of the regulation and the intent behind section 412.106(b)(4)(i) of Title 42 of the Code of Federal Regulations. (*See* Pls.' Mem. at 24–29; Pls.' Reply in Supp. of Mot. for Summ. J. & Opp'n to Def.'s Cross-Mot. for Summ. J. ("Pls.' Reply"), ECF No. 16, at 8–9.) The Hospitals further maintain that HHS's reading departs from the agency's practices in other cases (*see* Pls.' Reply at 24–25), and is an unfair, *post-hoc* rationalization that the agency did not provide or promote at the administrative stage of this dispute. (*See id.* at 22–24; 25–29.)

On September 28, 2018, this Court issued an Order that **GRANTED** Plaintiffs' motion for summary judgment, and **DENIED** Defendant's cross-motion for summary judgment. (*See* Order, ECF No. 25.) As a result, the Court also **VACATED** the challenged agency decision, and **REMANDED** this matter to HHS for further

proceedings.  (*See id.*)  This Memorandum Opinion provides the Court's reasons for that Order.

In short, after reviewing the parties' briefs, examining the record, and considering the oral arguments presented in this case, this Court concluded that HHS's interpretation of the unambiguous text of section 412.106(b)(4)(i) of Title 42 of the Code of Federal Regulations to disallow the inclusion of the patient days of service that were associated with patients who were covered by Commonwealth Care is an arbitrary and capricious determination, and thus violates the APA.  It is clear from the plain language of the regulation's text that patients who are eligible to receive comprehensive medical care through an insurance program authorized under a section 1115 waiver (as evidenced by their eligibility for inpatient hospital services) are to be included in the Medicare reimbursement formula, and whether or not the waiver agreement through which the Secretary authorized the program *says* anything about their eligibility for inpatient hospital services is irrelevant to the calculation of a hospital's disproportionate share hospital adjustment.  Furthermore, given that every individual enrolled in Massachusetts's Commonwealth Care program during the relevant time period obtained a subsidized insurance plan that actually provided coverage for inpatient hospital services, the Secretary's authorization of the Commonwealth Care program under the pertinent section 1115 waiver made every individual insured via Commonwealth Care "eligible for inpatient hospital services" within the meaning of section 412.106(b)(4)(i).  Therefore, per the plain text of the applicable regulation, HHS should have counted the patient days pertaining to Commonwealth Care beneficiaries when calculating the Hospitals' disproportionate share hospital

adjustments under the Medicare program.

## I.   BACKGROUND

Congress authorized and established the federal Medicare and Medicaid
programs in two different subchapters of the Social Security Act, Pub L. No. 89-97
(1965), and the statutory provisions that pertain to each of these programs cross-
reference one another in various ways. *See Cooper Hosp.*, 179 F. Supp. 3d at 36
("Although the two programs share similarities, each functions in partial independence
of the other, albeit with many cross-references between the subchapters.").  For present
purposes, it is important to understand that "[t]he Medicare program provides federally-
funded health insurance to qualifying elderly and disabled individuals[,]" *Saint Francis
Med. Ctr. v. Azar*, 894 F.3d 290, 291 (D.C. Cir. 2018) (citation omitted); *see also* 42
U.S.C. §§ 1395–1395lll, and that, since 1983, the federal government has pursued this
goal by reimbursing hospitals for the services they provide to elderly and disabled
patients "based on the average rate of operating costs for inpatient hospital services . . .
at a fixed amount per patient, regardless of the actual operating costs" that those
hospitals incur while treating those patients. *Billings Clinic v. Azar*, 901 F.3d 301, 303
(D.C. Cir. 2018) (internal quotation marks and citation omitted); *see also Abington
Mem. Hosp. v. Burwell*, 216 F. Supp. 3d 110, 116–17 (D.D.C. 2016).  Consequently, as
far as Medicare reimbursements are concerned, patient counts matter.  Moreover, as
explained below, Medicare's reimbursement formulas take into account a variety of
factors, including whether a particular hospital's actual costs are significantly higher
than average due to its treatment of low-income individuals.  Thus, the Medicare
payment system's base per-patient rates are subject to a variety of adjustments that

increase or decrease the total sum that the government pays each hospital.  *See Billings Clinic*, 901 F.3d at 304; 42 U.S.C. § 1395ww(d)(1).

## A.  Medicare's Disproportionate Share Hospital (DSH) Adjustment

The instant dispute homes in on one of these hospital-specific adjustments to Medicare's base payment rates: "the disproportionate share hospital (DSH) adjustment." *Billings Clinic*, 901 F.3d at 304 (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).  In essence, this adjustment constitutes a "supplemental payment[]" to hospitals that treat a "significant number" of "very low-income patients[.]" *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1105 (D.C. Cir. 2014).  The DSH adjustment reflects Congress's recognition that "[h]ospitals that serve a disproportionate numbers of low-income patients have higher [M]edicare costs per case[,]" H.R. Rep. No. 99-241, pt. 1, at 16 (1985), and that absent this additional payment, the standardized rates that Congress has authorized for certain medical expenses would not cover the full operating costs for these hospitals, *see Cooper Hosp.*, 179 F. Supp. 3d at 37.  Thus, under the Medicare statute, if a hospital treats a significant number of low-income individuals—*i.e.*, if its "disproportionate patient percentage" is sufficiently high—it is entitled to receive additional payments from the federal government.  *See* 42 U.S.C. § 1395ww(d)(5)(F)(v).

To calculate a hospital's "disproportionate patient percentage[,]" HHS "add[s] together two fractions": the "Medicare fraction" and the "Medicaid fraction[.]" *Allina*, 746 F.3d at 1105; *see also* 42 C.F.R. § 412.106 (laying out how both fractions are calculated).  The instant case concerns only the Medicaid fraction, which "account[s] for the number of Medicaid patients . . . not entitled to Medicare" that a hospital serves. *Allina*, 746 F.3d at 1105 (emphasis omitted).  Section 1395ww(d)(5)(F)(vi)(II) of Title

6

42 of the United States Code defines that figure as:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [the Medicaid program], but who were not entitled to benefits under Plan A of [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Put simply, "the numerator" of the Medicaid fraction "is the number of patient days attributable to patients who (for such days) were eligible for Medicaid, but not entitled to benefits under Medicare Part A[,]" and "[t]he denominator is the total number of patient days[.]" *Allina*, 746 F.3d at 1105 (internal quotation marks, citation, and alteration omitted).[2]

### B. Medicaid's Demonstration Project Expansion Waivers

As the above definition makes clear, determining whether an individual is eligible for health insurance under the *Medicaid* program is critical to calculating "the Medicaid fraction" for the purpose of establishing the *Medicare* program's DSH adjustment. Unlike the Medicare program, which is a purely federal endeavor that insures the elderly and disabled, "Medicaid is a cooperative federal-state program that provides medical assistance to certain limited categories of low-income persons and other individuals who face serious financial burdens in paying for needed medical care." *Cooper Hosp.*, 179 F. Supp. 3d at 38 (internal quotation marks and citation omitted). States that wish to participate in this program draw up a medical assistance plan that conforms to the requirements laid out in the federal Medicaid statute, *see* 42

---

[2] Each "patient day" represents a day during which the hospital treated a given patient. Thus, if a hospital treated a patient for 8 days, that patient would garner the hospital 8 patient days. Similarly, if a hospital treated one patient for ten days and another patient for twenty days, those two patients would confer upon the hospital a total of thirty patient days, even if those patients' stays at the hospital overlapped.

U.S.C. § 1396a(a), and once HHS approves a state's plan, the state receives payments from the federal government in support of that program, *see id.* § 1396b.

Significantly for present purposes, some states also "try new or different approaches to the efficient and cost-effective delivery of health care services" for low-income residents, or seek "to adapt their [healthcare] programs to the special needs of particular areas or groups of recipients." *Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844, 845 (D.C. Cir. 2008) (internal quotation marks and citation omitted); *accord* 42 C.F.R. § 430.25. To that end, the Medicaid statute gives the Secretary of HHS the discretion to waive some of the requirements laid out in the Medicaid statute and yet still designate the state as eligible for federal financial support under the Medicaid program. *See* 42 U.S.C. § 1315. When the Secretary executes such a waiver, the state plan for which the Secretary has waived the Medicaid statute's requirements is termed a "demonstration project[,]" 42 U.S.C. § 1315, and the "costs of such project"—including the costs of patient treatment—"shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved under [the Medicaid program], or for administration of such State plan or plans, as may be appropriate," *id.* § 1315(a)(2)(A); *see also Cookeville Reg'l*, 531 F.3d at 845.

One category of demonstration projects—known as "expansion waiver" projects—is of particular relevance to the legal issues presented in this case. Expansion waiver projects "provide medical assistance to expanded eligibility populations that could not otherwise be made eligible for Medicaid." *Cooper Hosp.*, 179 F. Supp. 3d at 45 (internal quotation marks and citation omitted). In other words, the patients who receive health insurance coverage through these programs either make too much money

to have a traditional state Medicaid program pay their healthcare costs, or are otherwise disqualified from receiving Medicaid. These patients are known as the "expansion waiver population[.]" *Cookeville Reg'l*, 531 F.3d at 845; *see also Banner Health v. Sebelius*, 715 F. Supp. 2d 142, 148 (D.D.C. 2010). States that seek to cover this population can apply to the Secretary for a waiver, *i.e.*, for approval of their proposed coverage plan as a demonstration project, and if the waiver is granted, the state will receive federal financial assistance as under the Medicaid program. *See* 42 U.S.C. § 1315(a); *Cookeville Reg'l*, 531 F.3d at 845; *Banner Health*, 715 F. Supp. 2d at 148.

## C. HHS's Amendment Of The DSH Adjustment Regulation

Before the year 2000, it was not clear whether the patient days attributable to low-income individuals who had received healthcare coverage through an expansion waiver demonstration project, as opposed to a traditional state Medicaid program, were to be counted within the numerator of the Medicaid fraction for the purpose of determining a hospital's disproportionate share adjustment under section 412.106(b)(4) of Title 42 of the Code of Federal Regulations. Considerable confusion arose because, while expansion waiver patients were technically *not* "eligible for medical assistance under" a state Medicaid plan, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), such patients had nonetheless received medical care through an insurance program expressly authorized under the laws that govern the Medicaid program. HHS has addressed this matter through notice-and-comment rulemaking, although the agency's position regarding the issue has evolved over time.[3]

---

[3] The agency conducted rulemaking activities to fill the gap in the statute that Congress's silence as to how the agency ought to treat expansion waiver populations with regard to DSH adjustment payments had created. Congress had not spoken to the issue presumably because, "at the time the Congress enacted the Medicare DSH adjustment provision[,] . . . there were no approved section 1115

HHS initially refused to count any patient days associated with individuals receiving medical care through an expansion waiver project in the Medicaid fraction's numerator unless those individuals would otherwise be covered under a state's Medicaid plan. *See Banner Health*, 715 F. Supp. 2d at 149. Then, in a regulation HHS promulgated on January 20, 2000, the agency changed course and permitted *all* patient days for expansion waiver populations to be counted in the numerator of the Medicaid fraction. *See* 65 Fed. Reg. 3,136, 3,137 (Jan. 20, 2000) ("[W]e believe allowing hospitals to include the section 1115 expanded waiver populations in the Medicare DSH calculation is fully consistent with the Congressional goals of the Medicare DSH adjustment[.]"); *see also* 42 C.F.R. § 412.106(b)(4)(ii) (codifying the understanding that the patient days relating to expansion waiver populations may be counted in the numerator of the Medicaid fraction). Notably, three years later, the agency added the caveat that is at the center of the instant dispute: it clarified that a patient shall be "deemed eligible for Medicaid on a given day"—and thus his patient days will count in the numerator of the Medicaid fraction, *see* 42 C.F.R. § 412.106(b)(4)—"only if the patient is *eligible for inpatient hospital services* under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2)" of the Social Security Act, *id.* § 412.106(b)(4)(i) (emphasis added). The Federal Register provision that accompanied this new language reiterated the agency's position that patient days under an expansion waiver should be included in the numerator of the Medicaid fraction to "the extent that those individuals receive inpatient benefits under the section 1115 demonstration

---

demonstration projects involving expansion populations[.]" 68 Fed. Reg. 45,346, 45,421 (Aug. 1, 2003). But in 2006, Congress expressly ratified HHS's understanding of the DSH adjustment statute and its rulemaking activities through the enactment of the Deficit Reduction Act, Pub. L. No. 109-71, 120 Stat. 4 (Feb. 8, 2006). *See Cookeville Reg'l*, 531 F.3d 847.

project[,]" and explained that the goal of this clarification was to prevent inclusion of patient days associated with demonstration project waiver populations that had, in fact, received only "limited, temporary benefit[s.]"  68 Fed. Reg. 45,346, 45,421 (Aug. 1, 2003).  HHS found this situation untenable, because while it is "fully consistent with the Congressional goals of the Medicare DSH adjustment" to "include[] the section 1115 expansion populations" in the Medicaid numerator, 68 Fed. Reg. 45,420, that policy decision applied to individuals "who received benefits under the demonstration project *that are similar to those available to traditional Medicaid beneficiaries*, including inpatient benefits[,]" *id.* at 45,420–21 (emphasis added); *see id.* at 45,421 (focusing on whether "individuals receiv[e] a comprehensive benefits package").  In other words, for the purpose of determining what share of a hospital's patients counted in regard to the Medicaid fraction, the key question was whether an individual had "receiv[ed] a *comprehensive* benefit package under a section 1115 demonstration project[.]"  *Id.* at 45,421 (emphasis added).

### D. Massachusetts's Medicaid And Commonwealth Care Programs

Massachusetts runs a federally-approved state Medicaid program, known as MassHealth, which provides medical assistance "to eligible low- and moderate-income individuals, couples, and families."  (Administrative Record Part 2 ("AR Pt 2"), ECF No. 21-2, at 357.)  That plan operates just like many other states' Medicaid programs: Massachusetts makes payments to health insurers and Medicaid-managed plan operators, who arrange for hospitals to provide the required medical services to low-income individuals (*see id.* at 362), and the federal government then reimburses Massachusetts for the federal share of these expenses (*see* Administrative Record Part 1 ("AR Pt 1"), ECF No. 21-1, at 25).

In 2006, Massachusetts decided to overhaul the landscape of its state healthcare system, and in so doing, established a novel health insurance program, called Commonwealth Care, to supplement its other state insurance plans. (*See* Compl. ¶ 34.) Commonwealth Care is "a private insurance-based premium assistance program for currently uninsured individuals at or below [three-hundred percent of the Federal Poverty Line] who are not eligible for MassHealth (Medicaid or SCHIP) or Medicare." (*Id.* at 361.) Thus, Massachusetts opted to provide health insurance for many individuals who were not otherwise eligible for insurance via either the Medicare or Medicaid programs (*see id.*), and to secure federal matching funds for the premium assistance it provided through this program, Massachusetts applied to the Secretary of HHS for a waiver of the requirements of the Medicaid statute pursuant to section 1115(a)(2) of the Social Security Act. Massachusetts first applied for an expansion waiver pertaining to Commonwealth Care in 2006, and then again in 2008 (*see id.* at 355–74), and the Secretary approved the state's applications, thereby confirming that "expenditures made by Massachusetts for the items identified below . . . shall, for the period of this Demonstration extension, be regarded as expenditures under the State's [Medicaid] plan" (AR Pt 2 at 15; *see also id.* at 18 (discussing the premium assistance for Commonwealth Care specifically)).

Importantly, neither Massachusetts's waiver application nor the Secretary's written approval of that waiver stated that any particular benefit or type of coverage would necessarily be included in the insurance packages that Commonwealth Care funded. (*See* AR Pt 1 at 355–74; AR Pt 2 at 15–20.) But the Commonwealth Care program in fact guaranteed that subscribers had an insurance plan that included

inpatient services: for those individuals who had an income of up to "100 percent of the federal poverty level," the Commonwealth Care program required a comprehensive care plan (AR Pt 1 at 329), and for those eligible subscribers whose income exceeded 100 percent of the federal poverty level, every authorized insurance plan under the Commonwealth Care program during the relevant time period covered "inpatient hospital services" (*id.* at 99 n.39; *see also id.* at 28).

### E. Procedural History

After the close of the fiscal year running from October 1, 2008, through September 30, 2009, twelve Massachusetts hospitals submitted cost reports to a fiscal intermediary in order to obtain reimbursement payments through the Medicare program. (*See id.* at 24.)[4] In determining what sums the federal government owed the Hospitals for that time period, the private contractor handling the Hospitals' cost reports decided to exclude from the numerator of the Medicaid fraction of the Medicare DSH adjustment calculation any patient days associated with individuals who had obtained premium assistance for health insurance through the Commonwealth Care program. (*See id.*) The contractor maintained that participating in the Commonwealth Care program did "not make a patient . . . 'eligible for Medicaid' as required by federal regulation" (*id.* at 26) because: (1) Commonwealth Care patients were not eligible for Medicaid by definition, given that the program sought to assist those individuals above Medicaid's income limits (*see id.* at 27), and (2), unlike traditional Medicaid programs,

---

[4] These submissions were consistent with standard practice: to receive reimbursements from the federal government under the Medicare and Medicaid programs, "eligible hospitals file cost reports with their fiscal intermediaries (usually private contractors and auditors) at the end of each fiscal year[,]" and the intermediaries issue a Notice of Program Reimbursement, wherein they determine the amount the Secretary owes participating hospitals. *Banner Health*, 715 F. Supp. 2d at 146.

Commonwealth Care paid for premiums on insurance instead of the "inpatient services themselves" (*id.*). This decision to exclude the patient days for individuals who were insured through Commonwealth Care decreased the Medicaid fraction for the Hospitals and thereby reduced the Hospital's DSH payments by approximately $6 million. (*See id.* at 24.)

The Hospitals appealed the Contractor's decision to the Provider Reimbursement Review Board ("PRRB") pursuant to section 1395oo(f)(1) of Title 42 of the United States Code. (*See id.*) The five-member Board voted to overturn the contractor's decision, with a majority of the members specifically concluding that "[t]he [section] 1115 waiver's expenditure authority undeniably allowed Massachusetts to claim Federal reimbursement" for its expenses related to the Commonwealth Care program. (*Id.* at 28.) The Board observed that the patient days resulting from Commonwealth Care "relate[d] to individuals who were enrolled in the same managed care plans and received the same core health benefits as other MassHealth recipients, including inpatient hospital services." (*Id.*) And the Board rejected "the Contractor's argument that the terms of [sections 412.106(b)(4)(i) and (ii) of Title 42 of the Code of Federal Regulations] were designed to include [only] days of care furnished to patients who were eligible for Medicaid services that were paid for with Title XIX funds," as opposed to a state's "providing a premium subsidy" to Commonwealth Care-eligible individuals "to purchase health care from the same managed care plan as provided to traditional Medicaid-eligible individuals." (*Id.*)

Two members of the PRRB filed a concurring opinion, wherein they also concluded that the Medicaid fraction's numerator must take into account the patient

days attributable to patients who received health insurance premium assistance through Commonwealth Care. (*Id.*) The concurring opinion identified the "key" issue as whether or not the "medical assistance" provided to Commonwealth Care enrollees did, in fact, include "inpatient benefits." (*Id.* at 30.) And, in that regard, the concurring PRRB members observed that, while "there [was] no explicit statutory or regulatory requirement" that individuals covered under Commonwealth Care and earning "greater than 100 percent of the Federal poverty level" receive inpatient hospital services benefits, the record contained "information that confirms that all [Commonwealth Care] beneficiaries . . . did in fact receive inpatient benefits." (*Id.* at 31 (emphasis altered).) Therefore, according to the concurrence, there was "sufficient evidence to find that [Commonwealth Care] beneficiaries received inpatient benefits as part of their benefit package under the [section] 1115 waiver." (*Id.* at 32.)

In the course of their analysis, the concurring members of the PRRB also expressly rejected the idea "that inpatient benefits must be *delineated* in the [section] 1115 waiver documents approved by [the agency] and/or that such benefits must be *guaranteed* under the [section] 1115 waiver." (*Id.* at 31 (emphasis added).) Instead, the concurrence opined that, for the associated patient days to be counted in the Medicaid fraction under the applicable regulation, inpatient hospital services benefits need only "be 'received' under the [section] 1115 waiver." (*Id.*)

The Administrator of the Center for Medicare & Medicaid Services considered— and reversed—the PRRB's decision. (*Id.* at 17.) *See also* 42 C.F.R. § 405.1875 (establishing the Administrator's authority to "review any decision of the Board"). Although the Administrator's lengthy written opinion is not a model of clarity, the

following language appears to summarize her conclusion:

> In sum, the Administrator finds that[] a § 1115 demonstration project for which patients are eligible must include inpatient hospital benefits in order for the hospital inpatient days to be counted as Medicaid days in the calculation of a hospital's DSH patient percentage. The record shows that patients only become eligible for inpatient services under the [Commonwealth Care program] if they buy the insurance offered thereunder. The fact that the subsidized premiums can be used to purchase inpatient benefits is irrelevant. As such, the Administrator finds and concludes that [Commonwealth Care] patients are not eligible for Medicaid or made eligible for inpatient services under the § 1115 waiver, and so the days of care furnished to these patients cannot be included in the Medicaid fraction pursuant to 42 C.F.R. § 412.106(b)(4)(i).

(*Id.* at 21.) Thus, the Administrator appears to have reasoned that because Commonwealth Care (*i.e.*, the relevant "demonstration project") does not *require* subscribers to enroll in plans that provide inpatient hospital benefits, and thus does not cover such benefits directly, the patient days that individuals covered under the Commonwealth Care program generate do not factor into the Medicaid fraction's numerator. (*Id.*; *see also id.* at 17–18.)

The Hospitals filed the instant action on May 16, 2017, as section 1395oo(f)(1) of Title 42 of the United States Code allows. (*See* Compl., ¶ 55.) Their complaint claims that the agency's decision to exclude the patient days attributable to Commonwealth Care patients was arbitrary and capricious, in violation of the standards of the Administrative Procedure Act, 5 U.S.C. § 706(2) (*see id.*), which applies to Medicare disputes, *see* 42 U.S.C. § 1395oo(f)(1). The Hospitals maintain that the Administrator's decision conflicts with both the "plain language of the Secretary's DSH regulation" and "the agency's intent at the time of [that regulation's] adoption." (Compl. ¶ 58; *see also* Pls.' Mem. at 2.) In response, the government has focused on a

line of argument that the PRRB addressed (rather than on the line of argument taken up by the Administrator); to wit, that the patient days generated through a demonstration project will count in the Medicaid fraction's numerator only if the Secretary's waiver expressly states that the demonstration project is authorized to provide inpatient hospital services. (*See* Def.'s Mem. at 19–22; *see also* Hr'g Tr., ECF No. 24, at 45:16–46:5.)

The parties' cross-motions are fully briefed (*see* Pls.' Reply in Supp. of Mot. for Summ. J. & Opp'n to Def.'s Cross-Mot. for Summ. J. ("Pls.' Reply"), ECF No. 17; Def.'s Reply; Pls.' Sur-reply to Def.'s Reply in Supp. of its Cross-Mot. for Summ. J. ("Pls.' Surreply"), ECF No. 20-1), and this Court heard oral arguments from both parties at a motion hearing on September 17, 2018 (*see* Hr'g Tr.).

## II.     LEGAL STANDARDS

### A. Summary Judgment In APA Cases

The Federal Rules of Civil Procedure require a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  However, in the context of a Medicare case, like in an APA case, that summary judgment standard "does not apply because of the limited role of a court in reviewing the administrative record." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 58 (D.D.C. 2018) (internal quotation marks and citation omitted); *see also Cooper Hosp.*, 179 F. Supp. 3d at 39 (explaining that the summary judgment standard for Medicare claims is the same as the summary judgment standard for APA cases); *Banner Health*, 715 F. Supp. 2d at 153 (same).  Thus, when confronting cross-motions for

summary judgment in a case such as this, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (internal quotation marks and citation omitted).

Consequently, with respect to claims brought under the APA, "[t]he entire case on review is a question of law, and only a question of law[,]" *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993), and a court must limit its review to the "administrative record" and the facts and reasons contained therein in order to determine whether the agency's action was "consistent with the relevant APA standard of review[,]" *Ho-Chunk, Inc. v. Sessions*, 253 F. Supp. 3d 303, 307 (D.D.C. 2017); *see also Caiola v. Carroll*, 851 F.2d 395, 398 (D.C. Cir. 1988).

### B. Arbitrary And Capricious Review

Under the APA, any person "adversely affected or aggrieved" by agency action has the right to seek "judicial review" of that agency decision, 5 U.S.C. § 702, so long as the agency has taken a "final agency action for which there is no other adequate remedy in a court[,]" *id.* § 704. As relevant here, the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" as well as any agency action that is not "supported by substantial evidence" in the administrative record. *Id.* § 706(2). Because this legal standard is quite broad, a plaintiff can challenge agency decision-making under the APA in various ways. *See Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196, 210 (D.D.C. 2016).

One of the most well-known limitations on agency action is the longstanding prohibition on agency determinations that contradict the agency's own regulations. *See*

*Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018), *appeal filed*, No. 18-5190 (D.C. Cir. June 15, 2018). To be sure, "it is within the power of an agency to amend or repeal its own regulations," *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. Envtl. Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks, citation, and alterations omitted); however, "an agency is not free to ignore or violate its regulations while they remain in effect[,]" *id.* (internal quotation marks, citation, and alteration omitted). Thus, "if an agency action fails to comply with its [own] regulations, that action may be set aside as arbitrary and capricious." *Erie Boulevard Hydropower, LP v. Fed. Energy Regulatory Comm'n*, 878 F.3d 258, 269 (D.C. Cir. 2017).

Of course, when determining whether or not an agency has acted in a manner that is contrary to its regulations, the court must first determine what the regulations require. And to the extent that the agency has offered up an interpretation, courts generally "accord 'substantial deference'" to the agency's interpretation under the doctrine of *Auer v. Robbins*, 519 U.S. 452 (1997), so long as it is not "plainly erroneous or inconsistent with the regulation." *Mellow Partners v. Comm'n'r of Internal Revenue Serv.*, 890 F.3d 1070, 1079 (D.C. Cir. 2018); *see also Otsuka Pharmaceutical Co. v. Burwell*, 302 F. Supp. 3d 375, 390 (D.D.C. 2016) ("[T]he *Auer* standard provides for an even greater degree of deference to the agency than the standard that *Chevron* establishes." (internal quotation marks, citation, and alteration omitted)).

"Courts typically consider three factors when deciding whether to apply *Auer* deference." *Mellow Partners*, 890 F.3d at 1079. First, "the language of the regulation in question must be ambiguous[.]" *Drake v. Fed. Aviation Admin.*, 291 F.3d 59, 68

(D.C. Cir. 2002). Second, "there must be 'no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question[,]'" *id.* (quoting *Auer*, 519 U.S. at 462), and third, the agency's interpretation must "be fairly supported by the text of the regulation itself, so as to ensure that adequate notice of that interpretation is contained within the rule[,]" *id.* If these criteria are met, courts will generally defer to the agency's interpretation of its regulation, even if that interpretation does not reflect the "best" possible reading of the regulation. *Decker v. Northwest Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013).

## III.   ANALYSIS

The parties in the instant case chiefly dispute whether HHS correctly interpreted the phrase "the patient is eligible for inpatient hospital services . . . under a waiver authorized under section 1115(a)(2)[.]" 42 C.F.R. § 412.106(b)(4)(i). HHS says this language requires that the Secretary must have *stated* in the terms and conditions of the section 1115 waiver that individuals obtaining insurance through the given demonstration project are "eligible for inpatient hospital services[.]" (*See* Def.'s Reply at 5.) But the agency never explains *why* the regulation concerning DSH adjustments would contain such a requirement, and for the reasons explained fully below, this Court concludes that it does not.

In short, the plain language of the applicable regulation unambiguously requires that all patient days attributable to individuals receiving health insurance through Medicaid or through a roughly equivalent authorized demonstration project (as evidenced by the provision of "inpatient hospital services") must be counted in the Medicaid fraction's numerator. There is no dispute that the coverage provided to

subscribers of Massachusetts's Commonwealth Care program is roughly equivalent to Medicaid insofar as every individual covered under the Commonwealth Care program did in fact receive premium assistance with respect to a health insurance plan that provided benefits for inpatient hospital services; moreover, when the Commonwealth Care waiver was issued, the Secretary incorporated the entirety of that state-run healthcare coverage program into the authorized demonstration project. This means that, for the purpose of the calculation at issue, the fact that the waiver document itself makes no reference to "inpatient hospital services" is irrelevant, and HHS acted in a manner that was contrary to its own regulations when it refused to count the patient days associated with the Commonwealth Care program in the numerator of the Hospitals' Medicaid fractions. Accordingly, and on this basis alone, HHS's determination must be set aside.

### A. Under Section 412.106(b)(4), The Patient Days Attributable To Individuals Who Are Eligible For Inpatient Services Pursuant To A Waived Demonstration Project Must Be Included In The Medicaid Fraction's Numerator

The plain language of section 412.106(b) of Title 42 of the Code of Federal Regulations establishes certain requirements for calculating a hospital's DSH adjustment; moreover, and importantly, it also provides the *context* in which the established computation is to be made. It is crucial to recall that context, for it appears that HHS has lifted words from the middle of the applicable text, and has presented them standing alone, thereby suggesting that the provision at issue requires something quite different than its unambiguous meaning when the terms of the regulation are considered as a whole. There can be no question that, like the words of a statute, the words of a regulation must be viewed in context. *See Utility Air Regulatory Grp. v.*

*Envtl. Prot. Agency*, 134 S. Ct. 2427, 2441 (2014) (pointing to "the 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme'" (internal quotation marks and citation omitted)).   And the relevant requirements of section 412.106(b) could not be clearer.

To start, the regulation plainly indicates that it is "[t]he fiscal intermediary" who "determines . . . the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A[.]" 42 C.F.R. § 412.106(b)(4).  This is the number that becomes the numerator of the Medicaid fraction (which the regulation calls "the second computation"), and thus, any subsequent language clarifying *how* the fiscal intermediary is to arrive at that number—including the language that HHS has seized upon—has to be considered relative to this ultimate objective.  *See id.* (introducing the subsequent directions by stating that "[f]or purposes of this second computation, the following requirements apply").[5]

As relevant here, the regulation then proceeds to expand the pool of qualifying hospital patient days of service, from merely those "days of service for which patients were eligible for Medicaid[,]" 42 C.F.R. §  412.106(b)(4), to include the days of service in which a patient "is eligible for inpatient hospital services under an approved State Medicaid plan *or* under a waiver authorized under section 115(a)(2)"—which is

---

[5] For further context, recall that subdivision (4) is part of a section—412.106(b)—that pertains to the calculation of the disproportionate patient percentage.  It states that HHS will "add[] the results of two computations[,]" *i.e.*, the Medicare and Medicaid fractions, 42 C.F.R. § 412.106(b)(1), and then lays out in detail how the agency will calculate each of these fractions, *see id.* §§ 412.106(b)(2), (b)(4); *see also Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 50 n.32 (D.D.C. 2008) ("42 C.F.R. § 412.106(b)[] only sets forth the method for computing the disproportionate patient percentage[.]").  Section 412.106(b) thus focuses solely on what the federal government owes to hospitals that treat a disproportionate share of low-income individuals.

indisputably *not* a state Medicaid plan—"regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver[,]" 42 C.F.R. § 412.106(b)(4)(i) (emphasis added). (*See also* Def.'s Reply at 6 n.1 (acknowledging that HHS uses the word "waiver" in this context synonymously with the phrase "demonstration project").) Notably, this expansion of the kinds of patient days that are to be included in the Medicaid fraction's numerator occurs via the regulation's instruction that "[f]or purposes of this computation, a patient is *deemed eligible for Medicaid on a given day* only if the patient is eligible for inpatient hospital services under" either the state Medicaid plan or a demonstration project waiver. 42 C.F.R. § 412.106(b)(4)(i) (emphasis added). This "deemed eligible for Medicaid" language is crucial, because that phrase unambiguously *equates* the patient days for Medicaid-eligible patients (which are expressly included in the Medicaid fraction computation per the prior paragraph) with the patient days of patients who, while not technically eligible for Medicaid, receive healthcare coverage under similarly comprehensive state-authorized plans, *i.e.*, plans that include inpatient hospital service benefits. *Cf.* Black's Law Dictionary 504 (10th ed. 2014) (defining "deem" as "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have"). Furthermore, when read as a whole, section 412.106(b)(4)(i) plainly indicates that a patient's *actual* eligibility for Medicaid, or an equivalent state-run healthcare plan, "on a given day" is what matters—*that* is what the fiscal intermediary is called upon to figure out—regardless of what the plan documents might say about eligibility for any particular service, and even if the hospital at issue provided the patient with "items or services" that were not themselves covered by the state Medicaid

plan or waiver.

In this regard, when a fiscal intermediary undertakes to determine who is "eligible for Medicaid" on a given day for the purpose of the Medicaid fraction, the word "eligible" is generally construed to mean "capable of receiving[.]" *See Covenant Health Sys. v. Sebelius*, 820 F. Supp. 2d 4, 12 (D.D.C. 2011); *accord Jewish Hosp., Inc. v. Sec'y of Health and Human Servs.*, 19 F.3d 270, 274 (6th Cir. 1994); *see also* Black's Law Dictionary 634 (10th ed. 2014) (defining "eligible" as "[f]it and proper to be selected or to receive a benefit"). Meanwhile, to the extent that a qualifying patient must be "eligible for inpatient hospital services *under*" a state Medicaid plan or approved waiver, the most natural meaning of the word "under" (and, indeed, the only one of its many potential definitions that appears appropriate here) is "subject or pursuant to" or "by reason of the authority of." *Ardestani v. Immigration & Naturalization Serv.*, 502 U.S. 129, 135 (1991) (internal quotation marks, citation, and alteration omitted); *see also id.* (remarking that "[t]he word 'under' has many dictionary definitions and must draw its meaning from its context"). Thus, once the fiscal intermediary turns to the task of evaluating which patients are to be deemed eligible for Medicaid on a given day for the purpose of the Medicaid fraction because they were "eligible for inpatient hospital services . . . under a waiver authorized under section 1115(a)(2)" on that day, the phrase "eligible for inpatient hospital services . . . under a waiver authorized under section 1115(a)(2)" is plainly understood as describing those individuals who were *capable* of receiving inpatient hospital services *pursuant to* the project that the Secretary approved in the section 1115(a)(2) waiver. 42 C.F.R. § 412.106(b)(4)(i).

HHS's insistence that the appropriate interpretation of this language turns, instead, on whether the legal terms and conditions that authorize the demonstration project themselves explicitly "require that inpatient services be provided to participants in that program" (Def.'s Mem. at 5) is wholly unpersuasive. First of all, and perhaps most importantly, HHS does not, and cannot, explain why the express terms of the demonstration project waiver agreement *matter* in the context of a regulation that is simply and solely concerned with the fiscal intermediary's proper calculation of a hospital's DSH adjustment given the population that it serves. HHS has plunged headlong into dictionary definitions of purportedly ambiguous terms, divorced from context, and in so doing has unquestionably lost its moorings: again, the point of the section at issue is to explain how HHS will determine who is to be deemed eligible for Medicaid for the purpose of the Medicaid fraction (*see* Part IV.A., *supra*); *see also Baystate Med. Ctr.*, 545 F. Supp. 2d at 50 n.32, and *other* agency rules address the contents of a demonstration project waiver—no part of section 412.106(b)(4) defines what a "demonstration project" is; expounds upon what a section 1115 waiver must or may contain; or describes the financial and legal obligations that the federal government incurs as a result of executing a section 1115 waiver. *Compare* 42 C.F.R. § 412.106(b)(4) *with id.* § 430.25 (laying out some of the requirements for the contents of these waivers); *id.* § 431.55 (setting forth the requirements for waiver applications). It is clear, then, that with respect to the task at hand, the Secretary's understanding of the scope of the demonstration project as expressed in the waiver agreement, or whether the Secretary "know[s], when he approves a demonstration project, whether or not he is

committing federal funds" via the DSH adjustment (Def.'s Reply at 8), is utterly irrelevant.

Given that section 412.106(b)(4) says nothing about the particular contents of a section 1115 waiver, and does not so much as cross-reference the portions of the Code of Federal Regulations that do in fact address a section 1115 waiver's requirements, it makes little sense to require fiscal intermediaries to look to the terms of the waiver agreement to identify those patients who are to be deemed eligible for Medicaid for the purpose of section 412.106(b)(4)'s Medicaid fraction computation, as HHS suggests here. Even so, requiring the Secretary to have stated affirmatively that the covered patients would be "eligible for inpatient hospital services" runs counter to the structure of the Medicaid program and the waiver system that Congress authorizes in section 1115, both of which make crystal clear that inpatient hospital coverage is the *default*, and that any explicit statement of the Secretary in the section 1115 process would *waive* such coverage, not authorize it. That is, by law, a state-run Medicaid program has to include benefits for inpatient hospital services, *see* 42 U.S.C. § 1396a (noting the requirements for "[a] State plan for medical assistance[,]" *i.e.*, a traditional Medicaid program); *id.* § 1396d(a)(1) (defining "medical assistance" to include the provision of "inpatient hospital services"), but the Secretary may waive this requirement (and others) through a section 1115 waiver, thereby treating such a demonstration project as a Medicaid program for reimbursement purposes, *see id.* § 1315(a)(1) (permitting the Secretary to waive the requirements of section 1396a of Title 42 of the United States Code). Thus, the statutory scheme establishes baseline circumstances that are precisely the opposite of the interpretation that HHS proposes here—*i.e.*, the Secretary acts

affirmatively to waive the requirement that inpatient services be provided to covered patients, not the other way around—yet HHS insists that, for patients who are covered through a demonstration project to be included in the relevant reimbursement formula, section 412.106(b)(4)(i) of Title 42 of the Code of Federal Regulations requires an affirmative and express adoption of inpatient hospital coverage by the agency. (*See* Def.'s Reply at 5 (suggesting that "[t]he special terms and conditions of the Massachusetts demonstration project" must state "that Commonwealth Care beneficiaries *would* be eligible to have the costs of their inpatient hospital services covered by the insurance they purchased" (emphasis added)).) The agency's inversion of the background rule to imbue the waiver's silence with a meaning that is inconsistent with the waiver scheme itself creates a conflict with the Medicaid statute that renders the agency's reading "plainly erroneous[.]" *Drake*, 291 F.3d at 68 (explaining that "plainly erroneous" interpretations of agency rules are not entitled to *Auer* deference).

Finally, it is clear that HHS's statements during rulemaking do not support the interpretation that it seeks to advance now. The propositions that expansion waiver populations are "specific, finite populations identifiable in the award letters" and that "special terms and conditions apply to the demonstrations" (Def.'s Reply at 8 (quoting 68 Fed. Reg. at 45,420)) plainly stand merely for the unremarkable notion that a section 1115 waiver must identify the population that a demonstration project will serve, and that a section 1115 waiver needs "special terms and conditions" because the proposed demonstration project deviates from the statutory Medicaid requirements. *See*, *e.g.*, 42 C.F.R. § 430.25(d) (discussing the details of a waiver of Medicaid requirements). Thus, HHS has distorted these Federal Register statements in much the same manner as the

text of the regulation at issue; it finds significance in various words plucked from their context, when none actually suggests in the slightest that the Secretary must affirmatively state that patients are authorized to receive inpatient hospital services under the demonstration project when the waiver is approved in order for those patients to be deemed eligible for Medicaid for the purpose of computing the Medicare DSH adjustment.

In short, HHS's interpretation is out of sync with both the overall statutory Medicaid scheme and the structure of the Code of Federal Regulations, and thus this Court owes it no deference. *See Drake*, 291 F.3d at 68; *see also Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").

### B. Because Patients Who Were Covered By Commonwealth Care During The Relevant Timeframe Were Eligible To Receive Inpatient Services, The Patient Service Days Attributable To Such Patients Must Be Counted

Based on the waiver that the Secretary executed with respect to Massachusetts's Commonwealth Care program, there can be little doubt that the patient days attributable to patients who were covered by the Commonwealth Care program must be included in the Hospitals' Medicaid fraction. Notably, the section 1115(a)(2) waivers relevant to this case contained no carveouts that are relevant to this issue—*i.e.*, the waivers incorporated the entirety of the Commonwealth Care plan. Indeed, when describing the contours of what was being approved as a demonstration project and what populations would be covered under that project, the Secretary simply and solely stated the following:

> **Commonwealth Care**. Expenditures for premium assistance for the purchase of commercial health insurance products for uninsured individuals with income at or below 300 percent of the FPL who are not otherwise eligible under the Massachusetts State plan or any other eligibility category.

(AR Pt 2 at 17; *see also id.* at 22.)

Thus, the demonstration project at issue in this case encompassed the entirety of the Commonwealth Care program, and the only other general question from the standpoint of the fiscal intermediary who is charged with counting the patient days associated with an approved demonstration project under section 412.106(b)(4) of Title 42 of the Code of Federal Regulations is whether patients covered by Commonwealth Care were capable of receiving inpatient health services through the insurance plans this program financed. The record is unambiguous on this point, and there is no dispute among the parties: *every* Commonwealth Care patient was, in fact, eligible for inpatient hospital services. (*See* AR Pt 1 at at 28 (explaining that "[t]he record also shows that the [Commonwealth Care] days in this appeal relate to individuals who were enrolled in the same managed care plans and received the same core health benefits as other MassHealth recipients, including inpatient hospital services"); *see* Hr'g Tr. at 23: 6–9 (government counsel acknowledging that "Commonwealth Care apparently guaranteed[,] [] though it was not required by the demonstration project, it did in practice, under state law, guarantee inpatient hospital coverage").)

Accordingly, per the unambiguous language of section 412.106(b)(4), and in light of the undisputed facts pertaining to the healthcare plan at issue, any patient service days attributable to patients whom the Hospitals treated and who were covered by Commonwealth Care on those service days should have been included within the

numerator of the Medicaid fraction for the purpose of calculating the Hospitals' DSH adjustments.  Consequently, HHS's refusal to include such patient days in the numerator of the Medicaid fraction when calculating the Hospitals' DSH adjustments for the period between October 1, 2008, and September 30, 2009, was arbitrary and capricious agency action that must be vacated under the APA.[6]

## IV.    CONCLUSION

For the reasons explained above, and as set forth in the September 28, 2018, Order, this Court has **GRANTED** Plaintiffs' motion for summary judgment, and **DENIED** Defendant's cross-motion for summary judgment.  The Court has also **VACATED** the agency's decision, and **REMANDED** this case to the agency for further proceedings consistent with this Memorandum Opinion.


DATE:  October 26, 2018                    *Ketanji Brown Jackson*
                                           KETANJI BROWN JACKSON
                                           United States District Judge

---

[6] Because this Court concludes that HHS has acted in a manner that is inconsistent with the clear and unequivocal mandate contained within its regulations, this Court has no need to opine on the other arguments that the Hospitals have raised, including their contentions that HHS changed course without explanation; that the government has advanced a *post-hoc* rationalization in these proceedings to legitimize the underlying agency decision; or that HHS's interpretation would deprive the Hospitals of the fair notice to which they are entitled as a matter of constitutional due process.